**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:19-cv-00007-MR**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **APPROXIMATELY $13,205.54 IN U.S.** | ) | |
| **CURRENCY SEIZED FROM RAHKIM** | ) | |
| **FRANKLIN ON AUGUST 21, 2018 IN** | ) | |
| **RUTHERFORD COUNTY, NORTH** | ) | |
| **CAROLINA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court following a bench trial on May 6 and

7, 2021.  Upon consideration of the testimony and evidence presented by

the parties, the Court hereby enters the following Findings of Fact and

Conclusions of Law.

## FINDINGS OF FACT

### *The Traffic Stop*

1.     On the afternoon of August 21, 2018, the Claimant Rahkim Franklin

drove to the State Employees' Credit Union branch located in Forest

City, North Carolina, in order to apply for a loan to purchase a house. [T. 92, 313].

2. The house, which was located in Charlotte, North Carolina, was being sold by a family friend and had a purchase price of $267,000. [T. 92, 313, 348, 373-75; Claimants' Ex. 14].

3. Mr. Franklin had been instructed by the closing attorney to procure a cashier's check in the amount of $13,350 to use as a down payment on the house. [Claimants' Ex. 15].

4. Mr. Franklin brought approximately $23,000 in cash to the bank. [T. 24-25].

5. Mr. Franklin's co-claimant, Shelly Medrano, had given him $8,000 of those funds in order to contribute to the down payment. [T. 313, 348, 373-74].

6. Mr. Franklin and Ms. Medrano, who have a child together, planned to reside in the home together. [T. 175, 313; Doc. 60: Stipulations at ¶ 27].

7. Mr. Franklin was denied a loan at the bank due to a lack of proper documentation. [T. 92, 384; Gov't Ex. 15].

8. Once he was denied a loan, Mr. Franklin decided to deposit $9,500 of the funds in his State Employees' Credit Union checking account and

to use the remainder of the funds to pay off his car loan at Fifth Third Bank.  [T. 92, 390].

9.     Ms. Medrano testified that that she and Mr. Franklin had previously agreed that if Mr. Franklin was unable to acquire a loan, he could use the money to pay off his vehicle so that they would have one less bill to pay when they moved in together.  [T. 313-14].

10.    On his way to Fifth Third Bank, Mr. Franklin decided to stop at a restaurant on Main Street to pick up a takeout order he had called in earlier.  [T. 390].

11.    At approximately 3:10 p.m., Deputy Wilmer Chavez-Perez of the Rutherford County Sheriff's Office was patrolling Main Street, when he observed a white Honda Accord with overly tinted windows.  [T. 164-65; Doc. 60: Stipulations at ¶ 2].

12.    Deputy Chavez activated his lights and stopped the vehicle.[1]  [T. 165-66; Doc. 60: Stipulations at ¶ 1].

13.    When the driver rolled the car window down, Deputy Chavez recognized the driver as Mr. Franklin.  [T. 166].

---

[1] The Claimants do not contest the legality of the traffic stop. [Doc. 60: Stipulations at ¶ 3].

14.   Deputy Chavez also detected a strong odor of marijuana coming from the vehicle.  [T. 167, 190].

15.   Deputy Chavez asked Mr. Franklin to step out of the vehicle, and Mr. Franklin complied.  [T. 167].

16.   Deputy Chavez asked Mr. Franklin if he had any weapons on him, and Mr. Franklin replied that the only thing he had on him was money.  [T. 167].

17.   At that point, Mr. Franklin reached into his right pocket and pulled out a "big bundle of money," which Mr. Franklin stated was about $2,000. [Id.].

18.   Mr. Franklin in fact had $5,900.00 in U.S. currency in that bundle and $80.00 in his wallet.  [Gov't Ex. 5; Doc. 60: Stipulations at ¶ 7].

19.   Deputy Chavez conducted a window tint test and confirmed that the window tint was in violation of North Carolina law.  [T. 168].

20.   Deputy Chavez issued Mr. Franklin a written warning for the window tint violation.  [Id.].

21.   Deputy Chavez told Mr. Franklin that he could smell marijuana coming from his vehicle.  [T. 168-69].

22.   At that time, Mr. Franklin became very agitated and confrontational. [T. 169, 200].

4

23.	In light of Mr. Franklin's agitation, Deputy Chavez decided to call his supervisor, Sergeant Timothy Martin, to the scene.  [T. 169].  Deputy Jarred Guffey and Deputy Jordy Ray of the Rutherford County Sheriff's Office also arrived on the scene.  [Id.].

24.	Based on the odor of marijuana, Deputy Chavez and Deputy Ray conducted a search of the vehicle.[2]  [T. 170; Doc. 60: Stipulations at ¶ 4].

25.	During the search, the officers discovered loose marijuana "shake" on the floorboard and under the seat.  [Id.].

26.	Deputy Chavez explained that marijuana shake is loose marijuana that is left behind when someone rolls a marijuana cigarette.  [T. 171].

27.	When Deputy Chavez pointed out the shake in the floorboard, Mr. Franklin admitted that the substance was marijuana.  [T. 171, 192; Doc. 60: Stipulations at ¶ 8].

28.	Mr. Franklin also admitted to having smoked marijuana that day.  [T. 235; Doc. 60: Stipulations at ¶ 8].

---

[2] The Claimants do not contest the legality of the search of Franklin's vehicle.  [Doc. 60: Stipulations at ¶ 6].

29.    While he admitted that he referred to this substance as marijuana at the traffic stop, Mr. Franklin testified at trial that the substance was, in fact, smokable hemp and is legal to consume.  [T. 87].

30.    Deputy Chavez conceded that there is no appreciable difference in the appearance or smell of legal hemp and marijuana.  [T. 191].

31.    According to Deputy Guffey, a drug dog would not be able to distinguish between legal hemp and marijuana.  [T. 252].

32.    Deputy Chavez did not collect a sample of the marijuana shake, as the amount was not sufficient to warrant any charge of drug possession.  [T. 146, 171-72, 178; Doc. 60: Stipulations at ¶ 9].

33.    During the search, the officers located a "large amount of loose cash" stuffed in the center console of the automobile.  [T. 172].

34.    The total amount of cash found in the center console was $7,015.44. [Gov't Ex. 5; Doc. 60: Stipulations at ¶ 5].

35.    In the trunk of the car, the officers found a small plastic container that contained over $200 in change.[3]  [T. 247; Doc. 60: Stipulations at ¶ 7].

---

[3]Officers indicated on the inventory sheet that there was $210.10 in change located in this container.  [Gov't Ex. 5].  A subsequent count performed when the money was converted to a cashier's check revealed that there was actually $224.24 in change.  [Id.; Gov't Ex. 6; T. 113, 223].  Thus, the total amount of money recovered from Mr. Franklin's vehicle was $13,219.68, not $13,205.54 as alleged in the Complaint.  [Doc. 60: Stipulations at ¶ 12, n.2].

36.  The officers discovered a loaded 9mm handgun underneath the front passenger seat.  [T. 173; Doc. 60: Stipulations at ¶ 5].

37.  The officers also discovered a wallet knife during the search, but Deputy Chavez could not recall if that was on Mr. Franklin's person or in the vehicle.  [T. 174].

38.  After confirming that Mr. Franklin did not have a conceal carry permit, the officers arrested Mr. Franklin on concealed weapon charges for his possession of the firearm and the knife.  [T. 174, 219; Doc. 60: Stipulations at ¶ 10].

39.  As Mr. Franklin was being taken into custody, Deputy Guffey noted that Mr. Franklin smelled strongly of marijuana.  [T. 248].

40.  Mr. Franklin was not charged with a violation of the North Carolina Controlled Substances Act or any federal drug law in connection with the traffic stop.  [Doc. 60: Stipulations at ¶ 11].

41.  Nothing else, such as drugs or drug paraphernalia, was found during the vehicle search to suggest that Mr. Franklin was anything other than a user of marijuana.  [T. 147, 204, 210, 252-53].

42.  During the traffic stop, several members of Mr. Franklin's family as well as Ms. Medrano, arrived on the scene.  [T. 109, 175].

7

43. Ms. Medrano told Deputy Chavez that there was approximately $14,000 in the vehicle; that the money was hers; and that she had given the money to Mr. Franklin to make a car payment. [T. 176, 177, 213].

44. Deputy Chavez noted that Ms. Medrano appeared to be nervous. [T. 213].

45. When Deputy Chavez separately spoke to Mr. Franklin about the money in the vehicle, Mr. Franklin told him that there was about $8,000 in the vehicle, and that the money was his. [T. 177].

46. Mr. Franklin told the officers that he had an auto detailing business in Forest City. [T. 111, 119,181].

47. He also told the officers that he had just left the bank and that he was on his way to pay off his car. [T. 111, 192, 198].

### *Completion of the Search and Canine Sniff*

48. In light of the number of family members on the scene, Sergeant Martin made the decision to move the vehicle to the impound lot at the criminal interdiction narcotics building in order to complete the search of the vehicle and to conduct a drug dog sniff. [T. 120, 178].

49. A tow truck arrived to move Mr. Franklin's vehicle to the impound lot. [T. 249].

8

50. Deputy Guffey and the tow truck driver agreed that the vehicle "stunk of weed." [T. 249].

51. The officers conducted a drug dog sniff of the currency by setting up five identical-looking bags in the hallway of the criminal interdiction narcotics building. [T. 121-22].

52. Only the currency found in the center console was used for the dog sniff. [T. 123, 242, 250].

53. Deputy Gaffey, the canine handler, brought Jango, a trained and certified narcotics dog, to do a free air sniff. [T. 123-24; Doc. 60: Stipulations at ¶ 15].

54. Deputy Gaffey advised Sergeant Martin that the dog positively alerted on the bag that contained the currency. [T. 124].

55. The officers did not conduct a dog sniff of the vehicle. [T. 243].

### *Seizure of the Funds and Commencement of Forfeiture Proceedings*

56. After consultation with the Drug Enforcement Administration ("DEA"), the Rutherford County Sheriff's Office seized the Defendant Currency. [Doc. 60: Stipulations at ¶ 13].

57. The Defendant Currency was seized in the Western District of North Carolina. [Doc. 60: Stipulations at ¶ 14].

58.　On August 28, 2018, Detective James Mode timely completed a federal adoption request and submitted it to DEA.　[Doc. 60: Stipulations at ¶ 16].

59.　On the same day, August 28, 2018, Alicia Vega, Mr. Franklin's attorney at the time, filed a "Motion in the Cause" in Rutherford County District Court seeking the return of personal property items that were seized from him at the time of his arrest on August 21, 2018, including the Defendant Currency.　[Doc. 60: Stipulations at ¶ 17].

60.　On August 30, 2018, DEA approved the adoption request, and that same day, the Rutherford County Sheriff's Office converted the Defendant Currency to a cashier's check, made payable to the United States Marshals Service.　[Doc. 60: Stipulations at ¶ 18].

61.　On September 5, 2018, the day of the hearing on Mr. Franklin's Motion in the Cause, Detective Mode delivered the cashier's check to DEA in Asheville.　[Doc. 60: Stipulations at ¶ 19].

62.　The Rutherford County District Court issued an order finding, among other things, that it did not have jurisdiction over the Defendant Currency.　[Doc. 60: Stipulations at ¶ 20].

63.　On September 6, 2018, DEA transferred the cashier's check to the U.S. Marshal's Service.　[Doc. 60: Stipulations at ¶ 21].

64. DEA initiated an administrative forfeiture action against the Defendant Currency, and provided notice to Mr. Franklin and Ms. Medrano. [Doc. 60: Stipulations at ¶ 22].

65. On October 5, 2018, Mr. Franklin filed an administrative claim with DEA, asserting that he was the owner of the Defendant Currency. The matter was referred to the U.S. Attorney's Office for judicial forfeiture proceedings. [Doc. 60: Stipulations at ¶ 23].

66. On January 7, 2019, the United States filed this civil forfeiture action in rem against the Defendant Currency. [Doc. 60: Stipulations at ¶ 25].

## *Sources of the Funds*

67. Both Mr. Franklin and Ms. Medrano were 26 years old at the time of the traffic stop. [See Doc. 60: Stipulations at ¶¶ 24, 29].

68. Mr. Franklin engages in a number of cash-only money-making activities, including car detailing, dog breeding, and reselling luxury items and clothes that he purchases with a Neiman-Marcus credit card. [T. 61-76, 90].

69. Mr. Franklin does not know what his annual income is, and he does not file tax returns. [T. 29].

70. Mr. Franklin uses social media and his connection to rappers in the hip-hop community to depict a lifestyle that enhances his status in the community and promotes his business activities. [T. 62-77].

71. For example, Mr. Franklin frequently posts photos on social media depicting him wearing luxury items, posing with motorcycles and automobiles, displaying firearms, and traveling to various locales, such as Greece, Italy, and Mexico. [T. 79].

72. Mr. Franklin admitted that many of the items depicted in these posts are borrowed or merely props, and that almost all of the designer clothing depicted in the photos were later sold for a profit. [T. 62-77].

73. Mr. Franklin resides with his grandmother and his two brothers, both of whom have been convicted of felony drug offenses. [T. 361-62, 373].

74. Mr. Franklin's grandmother pays for his housing, utilities, and food. [T. 90, 366-67].

75. Because his grandmother provides for his basic living expenses, Mr. Franklin is responsible only for his car payments, cell phone bills, and child support to Ms. Medrano. [T. 91-92].

76. Mr. Franklin received an inheritance from his great-grandmother of $14,000 when he was 18 years old. [T. 363].

77. Mr. Franklin has owned a number of vehicles. He totaled one car, a black Honda, and received a $23,000 check from his insurance company. [T. 369]. He used some of those proceeds to pay off that car and had approximately six to nine thousand dollars left over. [T. 369].

78. Three days after the traffic stop that is the subject of this action, Mr. Franklin traded in his Honda and paid approximately $7,200 in cash as a down payment on a truck valued at $55,000. [T. 35-36, 390].

79. Mr. Franklin had some outstanding student loans from attending community college of approximately $3,000; in 2014 or 2015, he paid off those loans when he wrecked another vehicle, a white truck, and received a check for $14,000. [T. 372].

80. A review of Mr. Franklin's bank records indicates that in September 2018, Mr. Franklin made several cash deposits totaling in excess of $2,000. [Gov't Ex. 30 at 244].

81. On November 7, 2018, Mr. Franklin made a cash deposit of $5,600. [Gov't Ex. 30 at 251].

82. During the period from August 23, 2018 through September 24, 2019, Mr. Franklin withdrew more than $48,000 in U.S. Currency from his Wells Fargo checking account. [Gov't Ex. 30 at 244-291].

13

83. The $8,000 that Ms. Medrano gave Mr. Franklin was her life savings[4] that she saved over several years from her employment, gifts from family members, tax refunds, and financial aid refunds. [T. 315, 342-43].

84. Ms. Medrano kept the money in a shoe box in her closet. [T. 316].

85. At the time of the traffic stop, Ms. Medrano and her child lived with her parents, so she did not have many bills. [T. 315, 342-43; Doc. 60: Stipulations at ¶ 28].

86. Ms. Medrano was employed as a certified medical assistant at a children's clinic in Kings Mountain and earned approximately $20,000 per year. [T. 319, 327; Doc. 60: Stipulations at ¶ 30].

87. Ms. Medrano also worked at her parents' convenience store, where she was paid in cash. [T. 319].

88. Her parents and grandparents also gave her gifts of cash "all the time." [T. 322].

---

[4] The Government notes in a footnote in its post-trial brief that, although Ms. Medrano "is a party to this case and claimed the $8,000 was her 'life savings,' she did not attend the second day of the trial." [Doc. 87 at 9 n.6]. Prior to the commencement of trial, the Claimants' counsel requested permission to complete the examination of Ms. Medrano on the first day of trial and to excuse her from attending the second day of trial on the ground that she was scheduled to work that day and her absence for two days in a row would have created a hardship at her place of employment. The Court therefore draws no negative inference from Ms. Medrano's absence on the second day of trial.

14

## *Mr. Franklin's Prior Encounters with Law Enforcement*

89.    Mr. Franklin has a prior conviction for driving while impaired under the influence of marijuana.  [T. 97; Gov't Ex. 86].

90.    Mr. Franklin does not have any drug trafficking or other felony convictions.  [T. 140, 361].

91.    In August 2014, officers were called to a Forest City motel on a complaint of a strong odor of marijuana coming from one of the motel rooms.  In the motel room, officers found Mr. Franklin and his younger brother, Ikyiemie.  [T. 127, 282].

92.    Officers discovered approximately three pounds of marijuana in vacuum sealed bags under the mattress in the motel room as well as a set of digital scales.  [T. 127-28, 285].

93.    Mr. Franklin and his brother were both placed under arrest for possession with intent to manufacture, sell and deliver a controlled substance, felony possession of marijuana, maintaining a place for a controlled substance, and possession of drug paraphernalia.  [T. 128, 286].

94.    Officers also conducted a search of Mr. Franklin's vehicle, which was in the motel parking lot, and found $900.00 in U.S. currency.  [T. 286].

95. During a subsequent interview with law enforcement, Mr. Franklin admitted to having a "smoke bag" in the motel room. [T. 290].

96. Mr. Franklin's brother was ultimately found guilty of possession with intent to sell and deliver; the charges against Mr. Franklin were dismissed. [T. 361].

97. On another occasion in early 2015, Sergeant Martin accompanied officers who were executing an arrest warrant for one of Mr. Franklin's brothers at the residence of Mr. Franklin's grandmother. [T. 129].

98. Sergeant Martin saw Mr. Franklin and another young man sitting outside of the laundry room, which had an overwhelming odor of marijuana emanating from it. [T. 129].

99. The officers discovered two vacuum sealed bags of what appeared to be about two pounds of marijuana in the laundry room. [Id.].

100. Mr. Franklin admitted to having smoked marijuana shortly before the officers arrived. [T. 130].

101. As for the bags of marijuana, Mr. Franklin's brother admitted that those belonged to him, and the brother was arrested for possession. [T. 131].

102. Mr. Franklin was not charged with any controlled substance offense as a result of this encounter. [T. 139].

16

103. In December 2015, Officer Scott Haynes, a patrol officer with the Forest City Police Department, was conducting surveillance of a residence at 127 Thompson Street, where a number of vehicles had been observed coming and going in a short period of time. [T. 257-58].

104. Officer Haynes decided to follow one of those vehicles. When the vehicle failed to stop for a red light, he activated his blue lights to make a traffic stop, but the vehicle kept going. [T. 259].

105. While the vehicle was still moving, Officer Haynes saw the passenger side door swing open, and a passenger, who was not wearing shoes, jumped out of the vehicle and ran away on foot. [T. 260].

106. Officer Haynes stopped the vehicle and observed a pair of shoes in the passenger side area of the vehicle, along with 1.5 grams of cocaine. [T. 261].

107. Other officers pursued the fleeing passenger and eventually apprehended him; Officer Haynes identified the passenger as Mr. Franklin. [T. 261].

108. Mr. Franklin was charged with resisting arrest and misdemeanor possession of a controlled substance; however, there is no evidence that he was ever convicted of these offenses. [T. 262].

109. A search warrant was later obtained to search the residence at 127 Thompson Street, which was the home of Mr. Franklin's brother, Malik Franklin. [T. 262].

110. During that search, officers discovered a couple of grams of crack cocaine, a couple of grams of powder cocaine, 3.5 grams of marijuana, cash, and drug paraphernalia. [T. 263].

### *Mr. Franklin's Invocation of the Fifth Amendment*

111. During discovery, the Government propounded interrogatories to Mr. Franklin which asked whether he had ever been involved in the sale of illegal drugs and whether he had ever used illegal drugs; Mr. Franklin refused to respond to these interrogatories, citing the Fifth Amendment. [Gov't Ex. 13].

112. During Mr. Franklin's discovery deposition, counsel for the Government asked Mr. Franklin whether the Government had the right to take any of the Defendant Currency if it were earned from the sale of controlled substances. Mr. Franklin responded, "Of course, but I ain't never had anything from no substances." [Gov't Ex. 89 at 205].

113. Counsel for the Government then asked whether either the Defendant Currency that was seized or the $9,500 deposited immediately prior to

the traffic stop was from the sale of controlled substances, and Mr. Franklin replied, "No, sir." [Gov't Ex. 89 at 205].

114. Counsel for the Government then asked Mr. Franklin: (1) whether he had ever used any illegal drugs; (2) whether he had ever possessed any controlled substances not for his personal consumption; (3) whether he had ever sold any controlled substances; and (4) whether he had ever assisted any family members in the sale of controlled substances. For each of these questions, Mr. Franklin, upon the advice of counsel, invoked his Fifth Amendment right against self-incrimination. [Gov't Ex. 89 at 149-50, 152, 155].

115. Counsel for the Government also asked Mr. Franklin: (1) whether he possessed a scale to measure quantities of controlled substances; (2) whether he possessed various types of drug paraphernalia; (3) whether he had received any money in the past three years from the sale of controlled substances; and (4) whether he had any friends he has assisted in the sale of controlled substances. In response to each of these questions, Mr. Franklin *sua sponte* invoked his Fifth Amendment right. [Gov't Ex. 89 at 152-53, 155-56].

116. Counsel for the Government also asked Mr. Franklin whether he had ever received any drug counseling and whether he had any friends

who were involved in the sale of controlled substances. [Gov't Ex. 89 at 153, 156]. In response to these questions, Mr. Franklin *sua sponte* invoked his Fifth Amendment right [id.], even though his responses to these questions would not have been incriminating.

117. It became evident during the deposition that Mr. Franklin was confused and did not fully understand the right that he was invoking, as demonstrated by the following exchange:

DIRECT EXAMINATION BY MR. LETZRING:

Q    Was any of that $14,000 that was taken from you, was it from the sale of controlled substances?

A    No, sir.

Q    Was any of the $9,500 that you deposited in the Credit Union account, was any of that from controlled substances?

A    No, sir.

Q    I should have said from the sale of controlled substances.

BY MR. KILBOURNE:

Did that change your answer?

BY THE DEPONENT:

I'm really confused on this question, but –

DIRECT EXAMINATION RESUMED BY MR. LETZRING:

Q    Let me ask again, and then you tell me.  If you're confused I don't – I don't want you to just answer.  I want you to tell me what you're confused about.  Is any of the $9,500 in cash that you deposited in the Credit Union in Forest City on August 21st, 2018, did any of that come from the sale of controlled substances?  Illegal drugs?

A    Fifth Amendment.

Q    So let me – let me back up then.  Did any of the $14,000 that you – that was seized from you on August 21st, 2018, did any of that money come from the sale of illegal drugs?

A    Fifth Amendment.

BY MR. KILBOURNE:

     Objection, asked and answered, but (pause) –

DIRECT EXAMINATION RESUMED BY MR. LETZRING:

Q    Do you have any confusion about that question?

A    No.   It's like – me smoking weed a controlled substance? I really don't – I'm going to just stick to my Fifth, because I really don't understand fully.

Q    What do you not understand about that question?

A    The wording, basically everything.  I'm confused.

[Gov't Ex. 90 at 205-207].

118. At trial, Mr. Franklin did not invoke his Fifth Amendment right against self-incrimination and fully answered the questions posed by the Government's counsel. Specifically, he admitted having smoked marijuana [T. 87], and he denied that the Defendant Currency came from the sale of any controlled substances [T. 393].

119. At trial, Mr. Franklin testified that he had invoked his Fifth Amendment right during his deposition because he did not fully understand the questions that counsel for the Government was asking and that he did not understand at the time what the Fifth Amendment meant. [T. 18, 19].

## <u>CONCLUSIONS OF LAW</u>

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355. [<u>See</u> Doc. 60: Stipulations at ¶ 26].

2. This Court is a proper venue for this matter pursuant to 28 U.S.C. § 1395. [<u>See</u> Doc. 60: Stipulations at ¶ 26].

3. Pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), currency is subject to forfeiture if it was furnished or intended to be furnished by any person in exchange for controlled substances, if it is proceeds that are traceable to such an exchange, or if it was used or intended to be used to facilitate a violation of the Controlled

22

Substances Act. 21 U.S.C. § 881(a)(6). Here, the Government contends that the Defendant Currency is subject to forfeiture as "proceeds" of illicit drug transactions.[5]

4.   In a civil forfeiture action, the Government has the burden of establishing by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c)(1).

5.   To satisfy its burden, the Government may use evidence acquired after the complaint is filed. 18 U.S.C. § 983(c)(2).

6.   Additionally, the Court must consider the totality of the circumstances in determining whether the Government has met its burden. United States v. Thomas, 913 F.2d 1111, 1115 (4th Cir. 1990).[6]

---

[5] The Government initially pursued a facilitation theory as well, but it abandoned that theory at trial. [T. 402 ("We're pursuing this case under [a] proceeds theory."); see also Doc. 87: Gov't Post-Trial Brief at 1-2 (asserting only proceeds theory as basis for forfeiture)]. The Court, therefore, will limit its analysis to the issue of whether the Defendant Currency constitutes proceeds of illicit drug trafficking.

[6] Thomas was decided prior to the enactment of CAFRA, which increased the Government's burden from demonstrating probable cause for forfeiture to proving that the property is forfeitable by a preponderance of the evidence. Nevertheless, courts continue to routinely cite Thomas for the proposition that the Government's evidence must be considered in its totality when determining whether the Government has satisfied its burden of proof. See, e.g., United States v. $31,448.00 in U.S. Currency, No. 5:16-CV-177-D, 2020 WL 7050555, at *2 (E.D.N.C. Nov. 30, 2020); United States v. $40,000 in U.S. Currency, No. 5:17-CV-398-FL, 2018 WL 2371098, at *5 (E.D.N.C. May 24, 2018); United States v. $115,471.00 in U.S. Currency, No. 1:11CV318, 2017 WL 2842778, at *4 (M.D.N.C. July 3, 2017); United States v. $67,040.00 in U.S. Currency, No. 5:14CV75-RLV, 2015 WL 1418039, at *4 (Mar. 27, 2015).

7. Only if the Government meets its burden of demonstrating forfeitability does the burden then shift to the Claimants to show by a preponderance of the evidence that they are innocent owners of the defendant property. 18 U.S.C. § 983(c), (d)(1).

8. In order to demonstrate that the subject property constitutes "proceeds," the Government need not prove that the property is tied to any particular drug transaction. See United States v. $200,000 in U.S. Currency, 210 F. Supp. 3d 788, 795 (M.D.N.C. 2016), aff'd sub nom. United States v. Phillips, 883 F.3d 399 (4th Cir. 2018).

9. Circumstantial evidence is sufficient to establish that the Defendant Currency is proceeds traceable to criminal activity. See United States v. $433,908 in U.S. Currency, 473 F. Supp. 2d 685, 690 (E.D.N.C. 2007).

10. Here, the Government contends that evaluation of the totality of the circumstances supports a finding that the Defendant Currency is proceeds of illicit drug activity. Specifically, the Government argues that various factors—including Mr. Franklin's invocation of his Fifth Amendment right against self-incrimination; Mr. Franklin's lack of legitimate, verifiable income; Mr. Franklin's unexplained wealth; the Claimants' inconsistent statements regarding the ownership of the

24

Defendant Currency; Mr. Franklin's history of drug activity; and the positive canine alert—when considered in their totality support a finding of forfeitability. The Court will address each of these factors in turn to determine whether, in the aggregate, the Government has satisfied its burden of proof. See United States v. $5,000.00 in U.S. Currency, 40 F.3d 846, 849 (6th Cir. 1994).

### *Mr. Franklin's Invocation of the Fifth Amendment*

11. The Government contends that the Court should draw an adverse inference from the fact that Mr. Franklin asserted his Fifth Amendment right against self-incrimination during his discovery deposition and in written interrogatory responses.

12. The Court is permitted, but is not required, to draw an adverse inference from a civil litigant invoking their Fifth Amendment right against self-incrimination. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002); In re Phillips, Beckwith & Hall, 896 F. Supp. 553, 557 (E.D. Va. 1995).

13. The Court declines to draw such an inference here, as it is evident that Mr. Franklin was confused about the applicability of the privilege and was only attempting to follow the advice of his counsel in responding

to both the Government's written interrogatories and deposition questions.

14. Further, the Government's questions, as posed in the written interrogatories and deposition, were so broad as to encompass topics beyond what is relevant to this case—thus obviously raising Mr. Franklin's suspicion and confusion. As such, the very imprecise questioning by the Government's counsel caused Mr. Franklin's invocation of the privilege to carry no appreciable probative value.

15. Moreover, at trial, Mr. Franklin responded fully to counsel's questions regarding his illicit drug use and whether he had any involvement in the sale of controlled substances.

16. For these reasons, the Court declines to draw an adverse inference from Mr. Franklin's invocation of his Fifth Amendment in the course of discovery.

### *Mr. Franklin's Lack of Legitimate Verifiable Income*

17. The Government contends that Mr. Franklin's lack of legitimate verifiable income supports a finding that the Defendant Currency is, in fact, the proceeds of illegal drug activity.[7]

---

[7] The Government does not appear to challenge Ms. Medrano's claimed sources of income, at least with respect to the Government's case-in-chief.

18.	A claimant's lack of any reported income or work history, considered along with a claimant's history of substantial involvement in the sale of controlled substances, can be considered evidence that the seized currency is the proceeds of illegal drug activity. See United States v. Currency, U.S., $147,900.00, 450 F. App'x 261, 264 (4th Cir. 2011) (holding that lack of reported income or work history, when combined with possession of large sums of cash and engagement in drug activity was sufficient evidence that seized currency was proceeds of drug activities); United States v. 998 Cotton St., No. 1:11-CV-356, 2013 WL 1192821, at *13 (M.D.N.C. Mar. 22, 2013) ("Insufficient legitimate income to explain expenditures, *along with evidence of drug trafficking*, is evidence of property derived illegally.") (emphasis added).

19.	Here, while Mr. Franklin has not provided documentation of his reported income, such as business or tax records, he did provide explanations as to the sources of his income and particularly how he obtained the Defendant Currency, and the Court credits his testimony on this point.

20.	While Mr. Franklin's business activities are unorthodox by conventional business school standards, and admittedly not in compliance with the tax laws, Mr. Franklin's evidence is quite plausible. Importantly, the

Government has presented nothing in an attempt to refute this evidence. The burden of proof is on the Government, and based on the competing evidence regarding Mr. Franklin's sources of income, the Court finds and concludes that the Government has failed to meet its burden that Mr. Franklin's evidence is untrue.

21. Further, and more significantly, the Government has failed to prove that Mr. Franklin has a history of distributing controlled substances. At most, the Government proved that Mr. Franklin's *brothers* are so involved. But the Government's reliance on such evidence is equivalent to attempting to prove guilt by association or even guilt by blood.

22. At most, the Government has provided evidence that Mr. Franklin has a history of *using* controlled substances, primarily marijuana.

23. Thus, even if the Court were to find that Mr. Franklin does not appear to have legitimate, verifiable sources of income, Mr. Franklin's apparent lack of involvement in the sale of controlled substances renders the evidence of his income sources to be less than probative on the issue of whether the Defendant Currency is traceable to illicit drug activity.

## *Mr. Franklin's Unexplained Wealth*

24.   The Government contends that Mr. Franklin leads a lavish lifestyle, and that this unexplained wealth is evidence that the Defendant Currency is ill-gotten gains.  "Unexplained wealth is formidable evidence of ill-gotten gains because gross expenditures that exceed verifiable income suggests the wealth was derived illegally." United States v. $63,289.00 in U.S. Currency, No. 3:13-CV-00281-FDW, 2014 WL 2968555, at *6 (W.D.N.C. July 1, 2014); see also United States v. Grandison, 783 F.2d 1152, 1156 (4th Cir. 1986) ("It is clear [given the fact that Grandison was unemployed and only recently paroled] that evidence of unexplained wealth is relevant . . . as evidence of illegal dealings and ill-gotten gains.").

25.   While the Fourth Circuit has acknowledged that "carrying a large sum of cash is strong evidence of some relationship with illegal drugs," the Court also has recognized—in a decision dating back nearly thirty years—that "[f]ifteen to twenty thousand dollars is hardly enough cash, standing alone, to justify more than a suspicion of illegal activity." $5,000.00 in U.S. Currency, 40 F.3d at 850; see also Currency, U.S., $147,900.00, 450 F. App'x at 266 (noting that "$9,000 . . . is not an amount that on its own would suggest linkage to drug activity").  Thus,

the fact that Mr. Franklin had in excess of $13,000 in cash with him on the day of the traffic stop, standing alone, is insufficient to satisfy the Government's burden on proving that the funds were proceeds of drug trafficking activity.

26.  Mr. Franklin has provided evidence of sufficient sources of income to justify the expenditures that he has made.  Mr. Franklin explained that he is self-employed and involved in several money-making endeavors, including the buying and selling of luxury items through his use of social media.   He admittedly does not file tax returns and therefore presumably does not pay taxes on his income.  He resides with his grandmother, who pays most of his living expenses, leaving him free to spend his income on other items, such as automobiles and travel. When Mr. Franklin turned 18, he received an inheritance of $14,000 from his great-grandmother.  Additionally, he received at least two insurance payouts for totaled vehicles, which provided him the cash flow enabling him to purchase new vehicles as well as other items. Given the evidence presented by the Claimants of Mr. Franklin's living situation and the cash-only nature of his multiple activities, the evidence presented by the Government regarding Mr. Franklin's

"lavish" lifestyle[8] is insufficient to support a finding that the currency seized from Mr. Franklin on August 21, 2018 was ill-gotten gains.

## *Mr. Franklin's History of Drug Activity*

27.  Next, the Government argues that Mr. Franklin's history of involvement with illegal drugs and his affiliation with drug dealers favor a finding of forfeitability.

28.  Evidence of a claimant's "substantial involvement in the sale of controlled substances for several years" can serve as probative evidence that seized cash is connected with illegal drug activity.  See Currency, U.S., $147,900, 450 F. App'x at 264.

29.  Here, the Government has presented evidence of past drug-related incidents involving Mr. Franklin, including (a) Mr. Franklin's 2014 arrest at the Traveler's Inn Motel; (b) an early 2015 incident during which Mr. Franklin was present when his brother arrested at the Franklin

---

[8] In a footnote, the Government points out that Mr. Franklin also owns several firearms, which the Government contends "have long been recognized as being 'tools of the drug trade.'"  [Doc. 87 at 6 n.2 (quoting in part United States v. Ward, 171 F.3d 188, 195 (4th Cir. 1999)].  It is undisputed, however, that Mr. Franklin owned these firearms legally; he is not a convicted felon or an otherwise prohibited person.  Further, none of Mr. Franklin's firearms were subject to forfeiture by the Government.  The Government has not presented any evidence from which this Court could reasonably conclude that these firearms were owned for the purpose of furthering any criminal activity.  For the Government to suggest that a citizen's mere possession of firearms implicates that person in illicit drug trafficking is to strain credulity.  The Government's argument presents some Second Amendment considerations that counsel has apparently not considered.

31

residence; (c) a late 2015 incident in which Franklin was arrested for a user-quantity amount of cocaine; and (d) the fact that Mr. Franklin lives in his grandmother's home with his family members, some of whom are convicted drug traffickers.

30.    Mr. Franklin's prior arrests for personal possession are not relevant to the issue of whether he was engaged in the sale of drugs.  See United States v. Hall, 858 F.3d 254, 267 (4th Cir. 2017) ("Possession and distribution are distinct acts—far more people use drugs than sell them—and these acts have different purposes and risks.") (citation omitted).

31.    As for Mr. Franklin's 2014 arrest, which occurred more than four years before the 2018 traffic stop at which the Defendant Currency was seized, Mr. Franklin testified (without contrary evidence from the Government) that those charges were dismissed and that his brother admitted to his own guilt and was convicted in that incident.  Given the time span between the 2014 arrest and the 2018 traffic stop, and the fact that the charges against Mr. Franklin were ultimately dropped and his brother admitted guilt, the evidence of Mr. Franklin's 2014 arrest presents no support for the Government's contention of a connection between Mr. Franklin and any drug trafficking activity at the time of the

traffic stop in question. "The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct." Schware v. Bd. of Bar Exam. of State of N.M., 353 U.S. 232, 241 (1957).

32. It is undisputed that Mr. Franklin had not been accused of any drug trafficking activity since that 2014 arrest; every other incident cited by the Government, including the 2018 traffic stop itself, involved the possession of a personal use quantity of drugs. As best, this evidence reasonably supports an inference that Mr. Franklin is a user of controlled substances, not a drug trafficker.

33. As for Mr. Franklin's living situation, the only connection to drug trafficking created by this circumstance is guilt by association—or worse, guilt by blood. See United States v. One Lot of United States Currency ($36,634), 103 F.3d 1048, 1054-55 (1st Cir. 1997) ("Association with known criminals, without more, is, of course, not enough to establish probable cause."). The fact that Mr. Franklin resides with family members who have been convicted of drug trafficking offenses, standing alone, is insufficient to connect Mr. Franklin with any drug trafficking himself.

33

***Claimants' Inconsistent Statements***

34.     The Government next contends that the Claimants' inconsistent statements, both during the traffic stop and thereafter during administrative proceedings and the proceedings of this case, weigh heavily in favor of forfeiture.  Inconsistent and implausible answers given to law enforcement during a traffic stop can support a link to illegal activity.  See United States v. $67,040.00 in U.S. Currency, No. 5:14CV75-RLV, 2015 WL 1418039, at *4 (W.D.N.C. Mar. 27, 2015).

35.     Examined closely, the Claimants' statements at the traffic stop are not necessarily inconsistent or implausible.  At the time of the traffic stop, Mr. Franklin had approximately $5,900 on his person and approximately $7,000 in the center console of the car.  He had been asked to get out of the vehicle while speaking to the officers.  One of the officers then asked Mr. Franklin how much money *was in the car*, and he replied $8,000, which is a reasonably close estimate.  He also stated that the money was all his.  The evidence indicates that Ms. Medrano had given him $8,000 toward the down payment on a home for the two of them.  The evidence further indicates that the money Ms. Medrano had given him was in the center console of the car.  Under these circumstances, Mr. Franklin's assertions that there was about

34

$8,000 in the car, and that this money was his (that is, because it had been given to him by Ms. Medrano), are not inconsistent with the Claimants' assertions regarding the Defendant Currency.

36. When Ms. Medrano arrived on the scene, she told Deputy Chavez that there was approximately $14,000 in the vehicle, and that the money was hers. Those statements are not inconsistent with the other evidence as to the amount of currency in light of the fact that Ms. Medrano knew that Mr. Franklin had attempted to get a cashier's check in the amount of $13,500 to put a down payment on the house that they intended to buy (albeit in just Mr. Franklin's name) and live in together.

37. The fact that at various times, Mr. Franklin and Ms. Medrano both claimed ownership of the Currency is not surprising, given that they were in a relationship and had pooled their funds in an attempt to purchase a house where they would both live. The Claimants are lay people and are presumably not schooled in the law. For these reasons, the Court finds the Government's argument on this point to be unpersuasive.

**_Positive Canine Alert_**

38.    Finally, the Government contends that the fact that the narcotics dog positively alerted to the cash that had been in the center console of Mr. Franklin's vehicle constitutes evidence that such cash was proceeds of illicit drug activity.

39.    The cash to which the dog alerted, however, was located inside of a vehicle that smelled strongly of marijuana.   Mr. Franklin admitted during the traffic stop that he had been smoking marijuana, and multiple officers on the scene noted the strong odor of marijuana coming from Mr. Franklin as well.   In light of these circumstances, it is not surprising (in fact, it would be expected) that the cash located in the center console of that vehicle would also smell of marijuana.   At most, the positive canine alert establishes that the cash was within the vicinity of marijuana—a fact that was already known to the officers by virtue of the shake observed on the floorboard of the car and Mr. Franklin's admission that he had been smoking marijuana.   The positive canine alert is not at all probative of the subject currency having been obtained through illicit means.

## **CONCLUSION**

40.  In sum, the totality of the evidence presented by the Government fails to establish by a preponderance of the evidence that the Defendant Currency seized during the August 21, 2018 traffic stop was proceeds traceable to an exchange for controlled substances within the meaning of 21 U.S.C. § 881(a)(6).

41.  Because the Government has failed to satisfy its burden of proof regarding forfeitability, the Court need not address whether the claimants have shown by a preponderance of the evidence that they are innocent owners of the defendant property.  18 U.S.C. § 983(c), (d)(1).

42.  Judgment shall be entered in this matter in favor of the Claimants Rahkim Franklin and Shelly Medrano.

## **O R D E R**

**IT IS, THEREFORE, ORDERED** that any warrant issued against the Defendant Currency is **VACATED**, and the Government's Complaint of Forfeiture is **DISMISSED**.

**IT IS FURTHER DECLARED** that the Claimants Rahkim Franklin and Shelly Medrano are the rightful parties to have possession, custody,

37

and control over the Defendant Currency.

A Judgment consistent with this Memorandum of Decision and Order

shall be entered by the Clerk of Court contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: March 16, 2022

Martin Reidinger
Chief United States District Judge

38